Debbie and Doreen **SORIA** et al.,
Plaintiffs-Appellees,

v.

**OXNARD SCHOOL DISTRICT BOARD
OF TRUSTEES, Defendant-Appellant.**

No. 71-2929.

United States Court of Appeals,
Ninth Circuit.

Nov. 27, 1973.

See also 9 Cir., 467 F.2d 59.

Edwin M. Osborne, Ronald W. Sabo (argued), County Counsel, William A. Waters, Asst. County Counsel, Ventura, Cal., for defendant-appellant.

Thomas E. Malley, Camarillo, Cal., John A. Childers (Legal Aid Assoc.), Oxnard, Cal., Peter D. Roos, Joel I. Edelman (Western Center on Law & Poverty), Los Angeles, Cal., for plaintiffs-appellees.

David L. Norman, Asst. Atty. Gen., U. S. Dept. of Justice, Washington D. C., for intervenor U.S.A.

Before CHOY and GOODWIN, Circuit Judges, and McNICHOLS,* District Judge.

CHOY, Circuit Judge:

Debbie and Doreen Soria and other elementary school students in the Oxnard School District (the Students) brought this class action for declaratory and injunctive relief in the district court for themselves and all other similarly situated minority (Hispano/Negro) students. They alleged that the Oxnard School District Board of Trustees (the School Board/the Board) by certain acts and omissions had "consistently maintained and perpetrated a systematic scheme of racial segregation by capitalizing on a clear pattern of *de facto* racial segregation in Oxnard . . . ." Further, they charged that the Board had deprived them of equal educational opportunities in violation of the equal protection clause of the Fourteenth Amendment, and by reason of this destructive pattern of racial segregation had also deprived them of liberty in violation of that amendment's due process clause. The Board denied the allegations of un-

constitutional segregation and inequality, and asserted it had acted at all times in good faith without discriminating between racial and ethnic groups.

After a substantial volume of facts was obtained through discovery devices, the Students moved for summary judgment. Finding no material question of fact in dispute, the district court, 328 F.Supp. 155, granted summary judgment in favor of the Students and ordered the implementation of a desegregation plan for the district's elementary schools. The School Board appeals. We vacate and remand for further proceedings.

Since at least 1964, the Board has maintained neighborhood schools pursuant to its policy declaration that: "The Oxnard School District shall establish and maintain neighborhood schools so far as it is practical to do so." The Students do not claim that the attendance zones for these neighborhood schools have been intentionally gerrymandered by the School Board upon racial or ethnic considerations. Nor has the state of California or the city of Oxnard ever maintained a "dual school system" wherein students have been assigned to schools on account of race or ethnic background. Indeed, since 1963 California law has required that school boards alleviate racial imbalance in the state's schools, as far as reasonably feasible, regardless of the cause for the imbalance. Jackson v. Pasadena City School District, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963). Nevertheless, the facts adduced in the district court reveal the existence of a pattern of racial and ethnic disproportion within Oxnard's elementary schools under the neighborhood school policy of the Board.

The Oxnard School District is relatively small, consisting of twelve elementary schools and two junior high schools with the greatest distance between any two schools being approximately four miles. The two junior high schools are conceded to be racially and ethnically integrated and are thus not a part of this

---

* The Honorable Ray McNichols, United States District Judge for the District of Idaho, sitting by designation.

action. The elementary school geographic attendance zones are demo-. graphically grouped into three definable areas of the city. The Colonia in the eastern part of the city is primarily Hispano/Negro; the Northwest which is populated almost exclusively by Anglos; and the Southcentral where the racial and ethnic population is more evenly mixed.

The percentage breakdown of the district's 7,483 elementary school students by racial and ethnic origin is 55% Hispano/Negro, 43% Anglo and 2% other. Prior to November, 1970 when the School Board instituted a busing plan permitting certain students to attend schools other than those assigned to their neighborhood, ten of the district's twelve elementary schools were racially and ethnically imbalanced.[1]

From the facts presented to the district court through discovery by answers to interrogatories, affidavits, and admissions of the School Board, the Students submitted seventy-four proposed findings of fact as required by a local rule of court.[2] Except as to certain proposed findings deemed by it to be either conclusionary or overly subjective, the Board stipulated to every finding of fact proposed by the Students. These proposed findings of fact reveal certain actions of the School Board since 1961 with regard to the location of new school sites, use of temporary mobile classrooms, adoption of integration plans, student busing plans, and the placement

---

1. The racial and ethnic composition of the district's twelve elementary schools was as follows:

| | % Anglo | Anglo Students | Hispano/Negro Students |
|---|---|---|---|
| **Colonia** | | | |
| Juanita School | 6% | 40 | 606 |
| Ramona School | 4% | 25 | 507 |
| Rose Avenue School | 19% | 213 | 918 |
| | | 278 | 2031 |
| **Northwest** | | | |
| Curren School | 85% | 452 | 52 |
| Marina West School | 71% | 572 | 207 |
| Sierra Linda School | 83% | 598 | 88 |
| | | 1622 | 347 |
| **Southcentral** | | | |
| Brittell School | 65% | 251 | 122 |
| Driffill School | 25% | 183 | 547 |
| Elm School | 42% | 171 | 228 |
| Harrington School | 63% | 232 | 134 |
| Kalama School | 49% | 320 | 323 |
| McKinna School | 24% | 131 | 421 |
| | | 1298 | 1774 |

Cal.Admin.Code, Title V § 10421 provided: "For purposes of these regulations, a racial or ethnic imbalance is indicated in a school if the percentage of pupils of one or more racial or ethnic groups differs by more than 15 percentage points from that in all the schools of the district. . . ."

It is no longer open to question that Hispanos and Negroes may be grouped together for the purpose of determining whether a school or school system is unconstitutionally segregated since these groups suffer identical discrimination in treatment when compared with the treatment afforded Anglo students. Keyes v. School District No. 1, 413 U.S. 189, at 197–198, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); Cisneros v. Corpus Christi Independent School District, 467 F.2d 142, 144–145 (5th Cir. 1972). However, "[w]hat is or is not a segregated school will necessarily depend on the facts of each particular case." Keyes, supra at 196, 93 S.Ct. at 2691. Such factors as the racial and ethnic composition of each school's student body, the racial and ethnic composition of the faculty and staff as well as administration attitudes toward the school must all be recognized and taken into consideration as elements in the definition of a "segregated school."

2. United States District Court, Central District of California, Rule 3(g) states:

1. There shall be served and lodged with each motion for summary judgment pursuant to Rule 56 of the F.R.Civ.P. proposed findings of fact and conclusions of law and proposed summary judgment. Such proposed findings shall state the material facts as to which the moving party contends there is no genuine issue.

2. Any party who opposes the motion shall, not later than five (5) days after service of the notice of motion upon him, serve and file a concise "statement of genuine issues" setting forth all material facts as to which it is contended there exists a genuine issue necessarily to be litigated.

3. In determining any motion for summary judgment, the Court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are controverted by affidavit filed in opposition to the motion.

as well as teaching experience of the school staffs.

(1) *New school sites*—Between 1964 and 1966 the Board opened three new schools. Marina West opened in 1964, was built in the western extremity of the district and subsequently had a student enrollment which was 72% Anglo. In 1965 a new school was opened at the Rose Avenue site in the eastern section of the Colonia and thereafter had a student population which was 19% Anglo. Finally, the new Sierra Linda School was completed and opened for use in 1966. This school was located in the Northwest section of the city and had a student enrollment of whom 75% were Anglo.

The Board refused to agree to a proposed finding of fact that "the imposition of a neighborhood school plan on a racially segregated residential pattern had the foreseeable result of causing racially imbalanced attendance areas and therefore, such actions cast *de jure* overtones." The Board claimed that new schools were constructed only in overcrowded neighborhoods requiring new facilities and that, in all cases, attendance zone lines for the new schools were drawn with regard to natural boundaries such as major streets and highways.

(2) *Temporary classroom units*— Since 1961 the Board has authorized the addition of temporary, mobile classrooms known as "portables" to certain schools. Portables were used first at the Colonia schools but were later added to schools in the Northwest and Southcentral regions. The Students contend that the School Board has "consistently placed portables in such a way as to keep Anglos in Anglo schools and Hispano/Negroes in minority schools." The Board, however, refused to concede this to be true and asserted that portables were placed only where required because of overcrowded conditions.

(3) *Integration proposals*—The Board failed to adopt any of several integration plans suggested by various public as well as private groups and individuals. These include recommendations in 1963 by the N.A.A.C.P. that several oppositely imbalanced schools be paired, thereby reducing the disproportion of Anglos and Hispano/Negroes in each of the combined schools, and that certain boundary adjustments be made in the district. That same year the superintendent of the district suggested that "jig-sawed" boundary lines be drawn for the school attendance zones. In 1968 the Bureau of Intergroup Relations of the California Department of Education proposed changing certain boundaries, moving portables from Rose Avenue to majority inbalanced schools in the district, transporting pupils from the Colonia to other schools and pairing various schools. A so-called "Princeton Plan" was presented to the School Board in February, 1969, as well as a plan which again recommended pairing certain schools and moving portables from the Colonia. Similar suggestions were received in November, 1969, and as a part of its Master Plan for the district, the Board resolved the following month to "[m]ove portables from Colonia sites to reduce crowding, and to facilitate classroom space in the north and west of town for integration use." In February, 1970 a further resolution to relocate fourteen portable classrooms was adopted, and in April of that year specific schools outside the Colonia were scheduled to be the sites for these additional portables. However, in June the Board decided to postpone bids for the relocation and effectively rescinded the earlier resolutions.

The School Board rejected a proposed finding of fact that its failure to relocate portable classrooms to alleviate racial imbalance was "with knowledge of its results and cast overtones of *de jure* segregation." The Board argued instead that its failure over the years to adopt various plans is not culpable since it was under no duty to affirmatively achieve more racial balance in the school district.

(4) *Student bus transportation*—Beginning in February, 1964 the School

Board implemented an "open enroll-ment" plan for the purpose of alleviat-ing "*de facto*" segregation in the dis-trict. This plan proved minimally effec-tive. By October, 1965 only forty-seven students (there is no indication what percentage were Anglo or Hispano/Ne-gro) were attending schools in neigh-borhoods other than their own. The School Board revised its policy in 1970 when it authorized student busing in either of two situations. Where en-rollment in certain grade levels at a school were overcrowded, students were to be transported to less crowded schools on a "last-enrolled—first-bused" basis. And as underenrollment in a school pro-vided available space, students from throughout the district could choose to enroll in those schools.[3]

The Board refused to admit a pro-posed finding that its busing policy "ag-gravated the already existing segregated pattern . . . [N]evertheless the Board continued it, allowing Anglo stu-dents to escape the Colonia; the Board did this with full knowledge of the seg-regative effect of its policy and hypo-critically maintained that it was acting to alleviate segregation." Rather, the Board asserted, its student busing plan was not a ploy to allow "white flight" from the Colonia, but was undertaken in the hope of bettering the district's racial balance. Further it claimed that the busing plan in fact resulted in a better racial mix in the schools.

(5) *Teacher placement and experience*—As of June, 1970 there were 253 teachers in the school district of whom nineteen or 7.5 percent were His-pano/Negro. Each of the Colonia schools had a higher percentage of mi-nority teachers than this district-wide average, with a total of ten His-pano/Negro teachers assigned to the three Colonia schools. Moreover, with an average teaching experience of 8.83 years for the entire district, all three Co-lonia schools were below this mean while Curren and Sierra Linda schools were above this average with 11.1 and 11.8 years respectively.

3. The School Board policy pertaining to student bus transportation states in Article 7, Section 607.3: *Enrollment Regulations*—Pu-pils who reside within an attendance area established for the ensuing year, will have priority to attend that school. However, re-turning enrollees who are not in attendance by the end of the second week of school will abrogate their priority if classes at their grade levels have reached the district maximum. These children will be assigned to a school with available space. Pupils who move into an attendance area where the maximum en-rollments for their grades in that school have been reached shall be assigned to a school where space is available.
*Article 5 Open Enrollment 605.1—Purpose:* In order to alleviate the problems related to de facto segregation, and as a convenience to par-ents, the Oxnard School District permits open enrollment throughout the district on a space-available basis.
*605.2 Individual Intradistrict Transfer:* A parent may request a transfer of his child to attend a school outside his area of residence. Permission will be granted for the current year if space is available. Space available will be determined by average class size as established by the district. . . .
*605.4 Transportation*—Transportation to the new school becomes the responsibility of the parents; however, transportation will be pro-vided if there is space available on an existing bus route. Transportation provided under these circumstances may be discontinued whenever regularly authorized transportation requires the bus space.

The following table shows the change in Anglo imbalance within the district after commencement of the revised busing plan.

| | % Anglo Before Busing | % Anglo After Busing |
|---|---|---|
| **Colonia** | | |
| Juanita School | 6% | 4% |
| Ramona School | 4% | 3% |
| Rose Avenue School | 19% | 9% |
| **Northwest** | | |
| Curren School | 85% | 75% |
| Marina West School | 71% | 71% |
| Sierra Linda School | 83% | 81% |
| **Southcentral** | | |
| Brittell School | 65% | 57% |
| Driffill School | 25% | 24% |
| Elm School | 42% | 41% |
| Harrington School | 63% | 54% |
| Kalama School | 49% | 47% |
| McKinna School | 24% | 24% |

The Board controverted a proposed finding of fact that "the deficiency in Hispano/Negro teachers is manifest" and that the School Board "by hiring and placement of teachers, has stigmatized the District racially, and in particular, has stigmatized certain minority schools by making them more clearly racially identifiable."

The School Board contended that additional facts showed that there was no discriminatory pattern in the district's faculty hiring and placement policies. With regard to teacher experience, it pointed to the staff of Elm and Kalama Schools, where each school had less average teacher experience than any of the Colonia schools. Further, the Board asserted that an indication of its efforts to obtain quality teaching in the Colonia schools was the fact that the highest salary expenditure per pupil in the entire district was at Juanita School with Marina West ranking ninth. Finally, the School Board claimed that it has actively recruited Hispano/Negro teachers at a rate in excess of the state average.

In granting the summary judgment after considering all the facts submitted, the district court stated two independent grounds for its decision. First, citing Brown v. Board of Education (I), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) it held that the maintenance of racially separate educational facilities provided inferior educational opportunities to the Students and therefore denied them their rights to equal protection of the laws guaranteed by the Fourteenth Amendment.[4] Second, the court determined that "sufficient 'de jure overtones' established by the agreed-upon findings of fact . . . entitle plaintiffs to relief." 328 F.Supp. 155, 157 (C.D.Cal.1971). The court ordered the School Board to propose a desegregation plan in compliance with the State Board of Education's definition of a balanced school system so that no school differed from the racial-ethnic composition of the district as a whole by more than plus or minus fifteen percent.

After meetings between the parties, the Board submitted a proposed plan calling for the pairing of several schools and transporting of some students to school by bus. The district court approved this plan and ordered it into effect beginning in the 1971 fall school term. The Board attempted to stay the desegregation order by applications to this court and the Supreme Court, but these requests were denied.[5]

The School Board does not challenge here, as it had done earlier in applying for stays, any part of the remedial desegregation plan which the district court ordered be implemented. Nor does the Board contend that in granting summary judgment for the Students the court acted precipitously by precluding the possibility of a trial on the merits. Instead, in arguing for reversal it maintains that the district court's holding of "de jure overtones" was erroneous. Though it concedes that a significant part of the district is racially and ethnically imbalanced, the Board contends that such imbalance does not per se constitute a constitutional violation where the schools only reflect the racial and ethnic composition of the areas in which they are located.

4. The parties submitted extensive sociological data and studies on the issue of whether racially imbalanced classes and schools materially affect the educational opportunities of minority students. But, we do not reach and therefore intimate no view on the merits of this question.

5. The United States intervening pursuant to 28 U.S.C. § 2403 contends the constitutionality of the "Broomfield Amendment," Pub. L. No. 92–318, 86 Stat. 235, § 803 is drawn into question in this proceeding. A previous decision of this court on the School Board's request for a stay of the district court ordered desegregation plan obviates further consideration of this issue. Soria v. Oxnard School District Board of Trustees, 467 F.2d 59 (9th Cir. 1972). We there held that § 803 has no retroactive effect in a case pending at the time of the statute's effective date where the integration plan providing for student bus transportation is already in effect.

The School Board argues that under Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) it is required to integrate the district schools only if it caused the racial imbalance. In *Swann*, which involved school districts having a long history of deliberate racial segregation, the School Board points out, the Court cautioned against blaming the school district for other factors which may have contributed to some extent to the composition of schools. *Swann, supra* at 22–23, 91 S.Ct. 1267. The Board mentions such factors as zoning laws, low cost housing, and private restrictive covenants. Since there is no finding here that the School Board deliberately maintained two sets of schools in its system in order to carry out a policy of separating students on the basis of race, the Board maintains that no constitutional violation has been established. "Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination,. it might well be desirable to assign pupils to schools nearest their homes." *Swann, supra* at 28, 91 S.Ct. at 1282.

The Students, however, contend that *Swann* does not provide support for the School Board's position because the Court there was not faced with the issue of a school board's accountability in a non-formally segregated school system. The Court did not reach the question "whether a showing that school segregation is a consequence of other types of state action, without any discriminatory action by the school authorities, is a constitutional violation requiring remedial action by a school desegregation decree." *Swann, supra* at 23, 91 S.Ct. at 1279. Therefore, the Students maintain that the School Board's accountability for its segregated schools resulting as a natural, foreseeable consequence of its acts and omissions remains open for this court's consideration, regardless of any discriminatory motives behind such acts. The district court judge apparently accepted this legal theory since it ruled that the Board's contention that it had never intentionally or purposefully segregated its school system did not raise a disputed question of material fact for purposes of summary judgment. By so holding, the district court applied an improper legal standard for determining whether the Board had committed unconstitutional segregation.

In Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) the Supreme Court for the first time gave full consideration to a so-called "northern *de facto.* segregation" case where public schools had been operated under no constitutional or statutory provisions which either mandated or permitted racial or ethnic segregation of students. The district court in *Keyes* held that through various acts such as school construction policies, gerrymandering attendance zones, use of so-called "optional zones," and excessive use of portable classrooms, the Denver School Board had engaged in an unconstitutional policy of deliberate racial segregation in the Park Hill section of the city's school system. Affirming this finding of unconstitutional segregation, the Court held prerequisite the determination that the school authorities had intentionally discriminated against minority students by practicing a deliberate policy of racial segregation. The Court emphasized that the differentiating factor between so-called *de facto* segregation and the *de jure* segregation held constitutionally impermissible in Brown v. Board of Education (I), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) was that in the latter case there was present a *purpose or intent* to segregate. *Keyes, supra* 413 U.S. at 208, 93 S.Ct. 2686. Once a finding of intentional segregation is made, the school authorities must assume the affirmative obligation of converting their school system into a unitary one where "racial discrimination would be eliminated root and branch." Green v. County School Board, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).

Whether the School Board's acts and omissions here . constitute intentional segregation is disputed, at least by the Board. It refused to admit any of the Students' proposed . findings of fact which suggested that it had intentionally created or maintained segregated schools, and sought to have this issue litigated at a trial. In opposing summary judgment before the district court, the Board submitted the affidavit of Doran W. Tregarthen, Superintendent of the Oxnard School District, who declared that the racial imbalance in Oxnard was the result of neighborhood population patterns and not of intentional segregation by the School Board; that student assignments, busing policies, portable utilizations and selection of school construction sites were all based upon sound administrative determinations; that no students from the Northwest schools were bused into the Colonia during 1970–1971 because of the over-crowded conditions then present in the Colonia which prohibited any additional students from enrolling in those schools; that the district had an active recruitment program for hiring Hispano/Negro teachers and compared well with other districts in the state in their hiring of such minority teachers. These facts, if accepted by the district court, would negate a finding of intentional segregation. It is impossible to divine what evidence the School Board would have proffered in support of its contention that "sound administrative determinations" were the basis for its actions. These raised factual issues which should have been resolved at a trial.

■ On a motion for summary judgment the role of the district court is limited, since it does not try the factual issues but must determine instead whether there are any such issues to be tried. United States v. Bissett-Berman Corp., 481 F.2d 764, 767 (9th Cir. 1973); Nyhus v. Travel Management Corp., 151 U.S.App.D.C. 269, 466 F.2d 440, 442 (1972); American Mfrs. Mut. Ins. Co. v. American Broadcasting—Paramount Theaters, Inc., 388 F.2d 272, 279 (2d Cir. 1967).

The district court's conclusion from the agreed-upon facts that the School Board's acts and omissions constitute "de jure overtones" is inconclusive and vague on the question of the School Board's segregative intent. Although "overtones" certainly implies that there was present an intention to segregate, nowhere in either the district court's opinion or the undisputed proposed findings of fact is this conclusion made explicit. As stated by this court: "If the district court were permitted to weigh the evidence and resolve issues in making its findings of fact and conclusions of law, we could properly find from the evidence here that the findings and conclusions should be sustained. It is necessary to determine, however, whether viewing the evidence as a whole and the inferences to be drawn therefrom in the light most favorable to the [party opposing the motion for summary judgment] it may be said that there is no genuine issue of fact,[11] mindful also of the fact

"11. An issue of fact may arise from inferences to be drawn from the evidence, and all doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary judgment. Cameron v. Vancouver Plywood Corporation, 9 Cir. 1959, 266 F.2d 535, 539."

that there is no express finding to that effect by the district court." United States v. Western Electric Co., 337 F.2d 568, 572 (9th Cir. 1964); see also United States v. Lange, 466 F.2d 1021, 1026 (9th Cir. 1972).

The Students cite Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill.1969), aff'd, 436 F.2d 306 (7th Cir. 1970) as supporting their contention that summary judgment should be upheld in this case, since that case involved issues similar to those here and the grant of summary judgment for the plaintiffs was affirmed. But, in Gautreaux the question of the housing authority's intent to maintain residential segregation of the races by their choice

of sites for public housing projects was not disputed. In three separate affidavits, employees of the housing authority admitted that racial quotas had been used in determining those sites. 296 F. Supp. at 909. Nor was it disputed that city aldermen vetoed proposed sites in the white area because the 90% Negro waiting list for public housing would have created a concentrated Negro population in those sections of the city. 436 F.2d at 308. That situation is clearly distinguishable from the one here, where the School Board claims that only legitimate educational interests motivated its actions, and denies that it had an intent to create or maintain segregated schools. *See* St. Helena Parish School Board v. Hall, 287 F.2d 376 (5th Cir. 1961); Branche v. Board of Education, 204 F. Supp. 150 (E.D.N.Y.1962).

■ This court's decision in Kelly v. Guinn, 456 F.2d 100 (9th Cir. 1972) does not require a conclusion contrary to the one reached here. In *Kelly,* the district court concluded after a trial on the merits that the actions of the school authorities constituted a constitutional violation. Affirming that determination we specifically made reference to the district court's finding that: "While eliminating segregation for the students above the sixth grade level, the District, at the same time, aggravated the incidence of segregation at the elementary level by constructing two new elementary schools in the black residential area. This bifurcated neighborhood school policy of the Clark County School District is principally responsible for the aggravation of racial segregation in the elementary schools. . . ." 456 F.2d at 105–106. There are no findings here as to the cause of the "segregation" in Oxnard's elementary schools. Indeed, there is no designation as to which, if any, of the schools are in fact segregated as distinguished from being racially imbalanced. Only by inferring the necessary causation from the underlying facts could we conclude that any schools in Oxnard are segregated and that the segregation resulted from the School Board's discrim-

inatory actions or failure to take actions. This case, however, arising from the grant of summary judgment precludes the drawing of those inferences against the School Board. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Crystal City v. Del Monte Corp., 463 F. 2d 976, 981 (5th Cir. 1972); United States v. Western Electric Co., *supra* 337 F.2d at 572.

The record in this case, aside from the various pleadings and motions of the parties, consists primarily of copies of minutes of the School Board's meetings since 1956 and the School Board's answers to hundreds of interrogatories propounded by the Students. Although voluminous, its value for purposes of this appeal is questionable. The School Board's minutes are unenlightening since they merely acknowledge by recording the fact that certain actions were taken by the School Board. They contain no discussion of the options considered in making these decisions, and for the most part detail only the routine administrative decisions necessary in the normal operation of a school system. The School Board's answers to interrogatories, apart from their being condensed into the proposed findings of fact, are similarly of slight value. Yet, this is not surprising since the purpose of such interrogatories is not to guide the court in deciding the relative merits of the issues, but rather to limit and clarify the issues for the parties in preparation for further trial proceedings. *See* 4A Moore's Federal Practice at ¶ 33.02 (2d ed. 1972). In effect, this leaves only the undisputed proposed findings of fact and the arguments of counsel upon which to decide if the School Board has practiced a deliberate policy of racial segregation. The cold record consisting of even colder maps, charts and statistics does not provide an adequate foundation for making such determination. *See* Bradley v. Milliken, [6th Cir. slip opinion, filed Dec. 8, 1972] aff'g 338 F.Supp. 582 (E.D.Mich.1971);

**588**

Hoots v. Pennsylvania, 359 F.Supp. 807, 821 (W.D.Pa.1973).

Although the school district is a small one, this does not reduce the need for the full exploration of a trial, where evidence can be presented, witnesses examined and cross-examined. Consideration can there be given to the relative merits of the School Board's contentions that in selecting school sites, determining attendance zones, assigning students, utilizing portables, and hiring and placing faculty, only justifiable criteria formed the bases for such actions. In this context, the credibility, and therefore the weight to be accorded the school officials' testimony, is crucial (in determining whether there were available alternatives to those decisions, which would not have worsened the racial imbalance existing in the school system). United States v. School District 151, 301 F.Supp. 201, 226, 229–230 (N.D.Ill.1969), modified on other grounds, 432 F.2d 1147 (7th Cir. 1970).

■ The function of this court is not to determine whether there is sufficient evidence from which the requisite intent and cause of segregated schools can be deduced when there are no explicit findings on these questions and the parties raise contradictory inferences from the facts. "If reasonable inferences could be drawn . . . such that the issue would be submitted to the trier of fact, then [F.R.Civ.P.] Rule 56(c) leaves us no latitude and we must return that issue to the trier of fact, in this case the judge." Empire Electronics Co. v. United States, 311 F.2d 175, 180–181 (2d Cir. 1962); *see* Consolidated Electric Co. v. United States, 355 F.2d 437, 440 (9th Cir. 1966).

Since the fall of 1971 the School Board has been operating under the district court ordered desegregation plan. We shall not at this time undo that result and the remedial integration order shall remain in effect subject to the district court's discretion and final resolution of this litigation.

Vacated and remanded.