**Debbie and Doreen SORIA et al.,**
**Plaintiffs,**

v.

**OXNARD SCHOOL DISTRICT BOARD**
**OF TRUSTEES, Defendant.**

Civ. No. 70–396–HP.

United States District Court,
C. D. California.

Dec. 10, 1974.

Herbert D. Nowlin of Legal Aid Assoc. of Ventura County, Oxnard, Cal., and Joel I. Edelman, Western Center on Law and Poverty, Los Angeles, Cal., for plaintiffs.

Dorothy L. Schechter, County Counsel, William A. Waters, Asst. County Counsel, County of Ventura, Ventura, Cal., for defendant.

## MEMORANDUM OF DECISION FOLLOWING NINTH CIRCUIT'S REMAND

PREGERSON, District Judge.

This is a school desegregation case. Plaintiffs, Mexican American and Black American elementary school students, brought this action against defendant, the Oxnard School District Board of Trustees (the School Board/the Board) in order to obtain an affirmative plan of desegregation. On May 10, 1971, this court heard plaintiffs' motion for summary judgment on the question of the School Board's accountability for racial imbalance which, the parties agreed, prevailed at nine of Oxnard's twelve elementary public schools. In granting summary judgment, this court treated the case as a de facto segregation matter and ruled, contrary to the School Board's contention, that the question of the Board's intent to segregate its elementary schools did not raise a genuine issue of material fact in this case. This court's "Memorandum Granting Motion for Summary Judgment" is reported at 328 F.Supp. 155 (1971). In granting summary judgment, this court held that segregated elementary schools denied plaintiffs their rights to equal protection of the laws, guaranteed by the Fourteenth Amendment. To redress that denial, this court charged the School Board with an affirmative duty to provide plaintiffs with a racially balanced elementary school system and ordered the Board to submit to the court within twenty days a plan designed to eliminate segregation in the Oxnard elementary schools "root and branch." Such a remedial integration plan was adopted by the court on July 21, 1971, and has been in operation since that date.

This court's remedial integration plan was left untouched by the Ninth Circuit which on November 27, 1973 remanded this case for further proceedings on the issue whether the School Board had intentionally pursued a policy of racial segregation. Soria v. Oxnard School District Board of Trustees, 488 F.2d 579 (9th Cir. 1973). That issue was tried before this court for three days in September 1974.

Having heard oral testimony, having studied the exhibits, having perused counsels' post-trial briefs, this court concludes that the evidence convincingly shows that the School Board—beginning in the mid 1930's and extending to the early 1970's—had followed a policy of de jure racial segregation in the Oxnard elementary schools. Therefore, the school integration plan approved by this court on July 21, 1971, shall remain in effect.

The evidence clearly demonstrates the defendant's intent to segregate its elementary schools. Minutes from August 1934 to June 1939—discovered after the Ninth Circuit's decision in this case—chronicle the School Board's blatant intent to segregate Oxnard's elementary school children. Prior to the discovery of these School Board minutes (Exhibit 36), the Ninth Circuit had observed:

> Nor has . . . the city of Oxnard ever maintained a "dual school system" wherein students have been as-

signed to schools on account of race or ethnic background.

Soria v. Oxnard School District Board of Trustees, 488 F.2d at 580. These newly discovered minutes point out that just the opposite was true. The minutes clearly show that the School Board had the explicit intent to racially segregate its elementary school students. For example, under the topic "Segregation" the Board's minutes of August 7, 1934, memorialize these deplorable words:

Trustee Dockstader also brought up the matter of the segregation of Mexican children. After discussing the matter at some length it seemed to be the general opinion that complete segregation was impossible at the present time and that the matter was being handled in perhaps as satisfactory a manner as could be expected.

The minutes of November 4, 1936 corroborate the Board's segregative intent by these odious words:

President Dockstader stated that the Board was in favor of the principle of segregation, although it might not be entirely practical at this time.

To implement the "principle of segregation," the minutes for November 1936 to June 1939 show how Oxnard's School Board not only established and maintained segregated schools, but also established and maintained segregated classrooms within a school. Where segregated classrooms existed within a school, the Board had the additional problem of keeping children of different ethnic groups from playing together. In addressing this problem, the Board debated the feasibility of staggered playground periods and release times. Feasibility also dictated some exceptions to the Board's general principle of segregation. In some cases the "brightest" and "cleanest" of the "Mexican children" were placed in "white classes when the white class [was] small and the Mexican class [was] too large." (Minutes for September 13, December 12, and December 21, 1938.)

Initially, the Board's plans seemed to produce the desired results, because under the topic "Segregation" the minutes of April 19, 1937 read:

There seemed to be no agitation for further segregation of Mexican children and nothing further contemplated by the Board.

The Board's hope was short-lived, for in the fall of 1937 conditions became "quite unsatisfactory." The minutes of September 22, 1937 read in part:

Figures were offered showing the possibilities of handling the situation in two different ways:

a. The return of white children living in the south part of town to the Haydock School.

b. The complete segregation of Mexican children.

The adoption of some definite plan for dealing with the situation . . . seemed imperative and after quite a lengthy consideration of the matter, the Board members took with them figures and data for further study.

After the Board members considered the figures and data, the Board met on September 27, 1937. Its minutes for that date record the proceedings:

The Board met at the office of J. H. Burfeind with trustees Dockstader and Burfeind and Supt. Haydock present.

Taking the enrollment figures as presented at a previous meeting a typewritten plan was offered by Trustee Burfeind calling for all "Mexican" children living south of Fifth Street to attend the Haydock School, leaving all white and oriental children living south of Fifth Street in the Roosevelt and Wilson schools. The moving of Oriental children living south of Fifth Street to the Haydock School will be taken into consideration in case of future emergency, and no further shifting of pupils is intended.

This plan is to be put into effect at an early date.

The segregation plan was again discussed three days later. The minutes for September 30, 1937 caution:

> The one point to be carried out as soon as convenient and with as little "fuss" as possible was the transferring of Mexican pupils who live south of Fifth Street to the Haydock School.

According to the minutes of 1938 and 1939, the Board continued to be obsessed with the subject of school segregation plans, and their implementation. For example, the minutes of September 13, 1938 set out a plan that "calls for:"

a. The attendance of all children in the first, second, third, fourth and fifth grades living south of Fifth Street at the Haydock School.

b. The placing of white children of two grades in one class room when the classes are small and the combined classes would not be too large.

c. The retention of Mexican classes as such.

d. The placing of Oriental children in white classes that are not too large.

e. The placing of some of the brightest and best of the Mexican children in white classes when the white class is small and the Mexican class is too large.

In 1940, after considering the matter for a number of years, the Board built the Ramona Schoolhouse "for the convenience of the Mexican population." (Minutes of November 9, 1936 and June 27, 1939.) But the conveniences of the Ramona School were few. Its floor consisted of blacktop rolled over bare earth, its illumination came from a single bare bulb, its roof leaked, its toilet facilities were deplorable. Eleven years later, in 1951, to relieve Ramona's overcrowded conditions, the Board constructed the Juanita School within one block of Ra-

mona. Before this court's remedial order went into effect, few so called "Anglo" youngsters ever attended these two segregated barrio schools.

The roots of purposeful segregation, illustrated by the foregoing minutes, were not visible when this court granted plaintiffs' motion for summary judgment. In its memorandum opinion, filed on May 12, 1971, this court said:

> [T]his court further holds as a matter of law that . . . there are sufficient "de jure overtones" established by the agreed-upon findings of fact, as outlined by Mr. Kalish in oral argument, to entitle plaintiffs to relief. These "de jure overtones" arise from such practices as Open Enrollment, Individual Intradistrict Transfer (or "bussing"), location of new schools, placement of portable classrooms, failure to adopt proposed integration plans, and rescission of resolutions to relocate "portables."

Soria v. Oxnard School District Board of Trustees, 328 F.Supp. at 157.

When the foregoing words were written, those "de jure overtones" appeared to represent visible branches which foreshadowed a hidden segregative intent. But it took more digging by plaintiffs' attorneys to discover the School Board's minutes for the 1930's, thereby exposing the roots of the Board's discriminatory intent.[1]

That discriminatory intent extended, in more subtle forms, into the 1950's and 1960's. At the September trial, Harold R. De Pue who is presently the superintendent of the Castro Valley Unified School District in Alameda County, and who was superintendent of Oxnard School District from 1961 to 1965, testified that the same mentality that motivated the School Board during the late 1930's and early 1940's, when Ramona was built, existed in the 1960's. Although Superintendent De Pue wanted to integrate the Oxnard schools, he testi-

---

1. The Board's minutes for the decade of the 1940's and for the first half of the 1950's apparently have not been found. However, the minutes from August 1956 to February 1971 are in evidence as Exhibits 37 and 38.

fied that the Board chose to follow a "do nothing" policy. The conflict in philosophies resulted in De Pue's departure from his post as superintendent of Oxnard's schools.

The existence of the "do nothing" policy to preserve the segregation spawned in the 1930's is corroborated by other witnesses. Mr. Norman R. Brekke, the present superintendent of schools, explained that when he started to teach in Oxnard in 1958, the district's grammar schools were in fact segregated. Dr. Richard M. Clowes, superintendent of schools in Oxnard from 1949 through 1961 and presently Los Angeles County Superintendent of Schools, said that the grammar schools were in fact segregated when he arrived at Oxnard in 1949. Despite this fact, Dr. Clowes testified that the School Board took no action to integrate the schools or to relieve segregation during his term as Oxnard's superintendent.

During the 1960's, a number of desegregation plans, which were administratively and educationally sound and feasible, were presented to the Board, and rejected by it. Again, another witness, Mr. Thomas E. Kane, a member of the Oxnard School Board from 1963 to 1971, admitted that the Board took little positive action to correct segregation during the 1960's. Ironically, during that period, the School Board did take positive action to aggravate segregation. For example, in the mid 1960's, under the guise of pursuing a neighborhood school policy, the Board situated three new schools—Sierra Linda, Marina West, and Rose Avenue—within the district so that these schools were segregated on the very day they opened their doors. *See* Kelly v. Guinn, 456 F.2d 100, 105–106 (9th Cir. 1972).

■■ The evidence adduced at the September 1974 trial and the facts agreed-upon when this matter was first heard on May 10, 1971, on plaintiffs' motion for summary judgment ineluctably draw this court to the conclusion that the School Board, from the mid 1930's to the summer of 1971, pursued a deliberate policy of racial segregation in its elementary schools. In short, the court finds that the segregation which in fact existed in the district's elementary schools prior to the implementation of the court ordered desegregation plan was caused by the School Board's intentional, deliberate, and purposeful policy of racial segregation. This finding removes any impediment to plaintiffs' right to unremitting remedial relief under the Fourteenth Amendment's Equal Protection and Due Process Clauses. This conclusion is mandated by the Ninth Circuit's pronouncement that:

> Once a finding of intentional segregation is made, the school authorities must assume the affirmative obligation of converting their school system into a unitary one where "racial discrimination would be eliminated root and branch." Green v. County School Board, 391 U.S. 430, 438, [88 S.Ct. 1689, 1694, 20 L.Ed.2d 716] (1968).

Soria v. Oxnard School District Board of Trustees, 488 F.2d at 585.

The class action complaint, as originally filed on February 20, 1970, charged the School Board with depriving plaintiffs of equal educational opportunities in violation of the Equal Protection Clause and of liberty in violation of the Due Process Clause of the Fourteenth Amendment, the Civil Rights Act of 1871 (42 U.S.C. § 1983), and the Supreme Court's ruling in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

■■ After the Ninth Circuit's remand, plaintiffs, by leave of court, amended their complaint on March 16, 1974 to assert further federal and state law claims for relief against the School Board. These additional claims—which do not require proof of segregative intent—charge: (1) a violation of Title VI of the Civil Rights Act of 1964 and its implementing regulations, viz., 45 C.F.R. § 80; and, under the court's pendent jurisdiction, (2) a violation of Title 5 of the California Administrative Code,

i. e., §§ 14020 and 14021,[2] and the California Supreme Court's ruling in Jackson v. Pasadena School District, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963).

The evidence adduced at the September 1974 trial and the facts agreed-upon when this matter was first heard on plaintiffs' motion· for summary judgment also establish plaintiffs' right to relief under both Title VI of the Federal Civil Rights Act of 1964 and California law.

Section 601 of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) proclaims:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The implementing regulation requires "affirmative action to overcome the effects of prior discrimination." That regulation, 45 C.F.R. § 80.3(b)(6)(i), states in unequivocal language:

In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color or national origin, the recipient [of Federal financial assistance] must take affirmative action to overcome the effects of prior discrimination.

According to 45 C.F.R. § 80.3(b)(2), "A recipient [of Federal financial assistance] . . . may not . . . utilize criteria or methods of administration which have the *effect* of subjecting individuals to discrimination" or have "the *effect* of defeating or substantially impairing accomplishment of the objectives of the program as re-

2. Sections 14020 and 14021 of the California Administrative Code read in full as follows:

§ 14020. State Board Policy. It is the declared policy of the State Board of Education that persons or agencies responsible for the establishment of school attendance centers or the assignment of pupils thereto shall exert all effort to prevent and eliminate racial and ethnic imbalance in pupil enrollment. The prevention and elimination of such imbalance shall be given high priority in all decisions relating to school sites, school attendance areas and school attendance practices.

§ 14021. School District and State Responsibilities in Preventing and Eliminating Racial and Ethnic Imbalance.

(a) School Sites, Attendance Areas and Attendance Practices. In carrying out the policy of Section 14020, consideration shall be given to factors such as the following:

(1) A comparison of the numbers and percentages of pupils of each racial and ethnic group in the district with their numbers and percentages in each school and each grade.

(2) A comparison of the numbers and percentages of pupils of each racial and ethnic group in certain schools with those in other schools in adjacent areas of the district.

(3) Trends and rates of population change among racial and ethnic groups within the total district, in each school, and in each grade.

(4) The effects on the racial and ethnic composition of each school and each grade of alternate plans for selecting or enlarging school sites, or for establishing or altering school attendance areas and school attendance practices.

(b) Racial and Ethnic Survey. The governing board of each school district shall periodically, at such time and in such form as the Department of Education shall prescribe, submit statistics sufficient to enable a determination to be made of the numbers and percentages of the various racial and ethnic groups in every public school under the jurisdiction of each such governing board.

(c) Determination of Racial and Ethnic Imbalance and Corrective Plans. For purposes of these regulations, a racial or ethnic imbalance is indicated in a school if the percentage of pupils of one or more racial or ethnic groups differs by more than 15 percentage points from that in all the schools of the district.

A district shall study and consider possible alternative plans when the percentage of pupils of one or more racial or ethnic groups in a school differs significantly from the district-wide percentage. A district undertaking such a study may consider among feasibility factors the following: .

(1) Traditional factors used in ·site selection, boundary determination, and school organization by grade level.

(2) The factors mentioned in subparagraph (a) hereof.

(3) The high priority established in Section 14020.

(4) The effect of such alternatives on the educational program.

spect individuals of a particular race, color, or national origin." (Italics supplied.) In view of the regulation's focus on the "effects" of discrimination and the requirement of affirmative action, the court concludes that under § 601 and the implementing regulations, a recipient of Federal financial assistance has an affirmative duty to overcome the effects of discrimination when the recipient has utilized methods of administration which have resulted in racial discrimination, even though no purposeful design was present. This, in effect, was the holding of Lau v. Nichols, 414 U.S. 563, 568, 94 S.Ct. 786, 788, 39 L.Ed.2d 1 (1974) where the Supreme Court stated that "discrimination is barred which has that *effect* even though no purposeful design is present."

It is clear that § 601 of the Civil Rights Act and the implementing regulations support the conclusion that the Board has an affirmative duty to desegregate its schools. First, § 601 is applicable to school desegregation cases. Bossier Parish School Board v. Lemon, 370 F.2d 847 (5th Cir. 1967). Second, the Board is a "recipient" of Federal financial assistance and is therefore subject to the requirements of § 601 and accompanying regulations. Finally, the Board has contractually agreed to comply with Title VI of the Civil Rights Act of 1964 and the implementing regulations of the Department of Health, Education and Welfare. Lau v. Nichols, supra, 414 U.S. at 568–569, 94 S.Ct. 786. Despite this contractual agreement and the assurances of compliance required by 45 C.F.R. § 80.4, the Board had taken little, if any, "affirmative action to overcome the effects of prior discrimination," 45 C.F.R. § 80.3(b)(6)(i), until this court issued its remedial order in July, 1971.

Moreover, the Board has been in violation of California law. The law of California on the subject of school seg-

regation is succinctly stated by the Ninth Circuit in its opinion in this case:

[S]ince 1963 California law has required that school boards alleviate racial imbalance in the state's schools, as far as reasonably feasible, regardless of the cause for the imbalance. Jackson v. Pasadena City School District, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963).

Soria v. Oxnard School District Board of Trustees, 488 F.2d at 580. The parties agree that until this court's remedial order was put in operation in the fall of 1971, nine out of twelve elementary schools in the district were in fact racially imbalanced. The evidence also shows that even though reasonably feasible desegregation plans were available to the School Board, it failed to act on them. Clearly, plaintiffs have established their claim to affirmative relief under state law.

Accordingly, it is ordered that this court's remedial integration plan which has been in continual effect since July 1, 1971 shall stand. Until now that plan—under the inspiring leadership of Doren T. Tregarthen, former District Superintendent of Schools—has fulfilled its promise of equality and justice for all of Oxnard's elementary school children. That remedial plan shall continue in full force and effect.

## JUDGMENT

It is hereby ordered, adjudged, and decreed that:

1. The remedial integration plan ordered into effect by this court on July 21, 1971 shall continue in full force and effect.

2. The court retains jurisdiction of this case, closing the file subject to reopening on five days notice by any party hereto.